### SOUTHWESTERN MOTOR TRANSPORT, INC., Appellant,

v.

### Bob BULLOCK, Comptroller of Public Accounts of the State of Texas, et al., Appellees.

#### No. 13207.

Court of Civil Appeals of Texas, Austin.

April 8, 1981.

Marvin G. Pipkin, Green & Kaufman, San Antonio, for appellant.

Mark White, Atty. Gen., Gilbert J. Bernal, Jr., Asst. Atty. Gen., Austin, for appellees.

SHANNON, Justice.

Appellant, Southwestern Motor Transport, Inc., filed suit in the district court of Travis County to recover the sum of $8,674.41 paid by it under protest to the Comptroller of Public Accounts pursuant to Tex.Tax.-Gen.Ann. art. 1.05 (1969). The sum paid to the Comptroller represented a deficiency in franchise taxes assessed appellant by the Comptroller for the years 1968 through 1974. After a bench trial, the district court rendered judgment that appellant take nothing. This Court will reverse that judgment.

The controversy centers upon the manner in which the Comptroller's audit of appellant's records was conducted. Appellant claims that the audit was arbitrary and illegal, resulting in substantial injury to it. Preliminary to a discussion of the facts, it is important to observe that the Comptroller does not question the accuracy of appellant's books, records, and accounting systems.

To understand appellant's methods of record keeping, appellant's past, as well as present, operations must be noticed. Appellant is a common carrier of motor freight. Appellant selected a system of bookkeeping and accounting in 1932 and has continued to maintain this accounting system in compliance with generally accepted accounting principles.

In 1950, appellant merged with another truck line, and as a result, the Interstate Commerce Commission (ICC) for the first time acquired jurisdiction over appellant. It then became mandatory for appellant to employ the ICC accounting system, which is designed to produce uniform rate-making in the motor carrier industry. The ICC accounting regulations require that all entries be made according to an ICC accounting system, causing appellant to maintain its daily accounting entries in the ICC system. It was undisputed that the ICC accounting requirements have never been in complete compliance with generally accepted accounting principles.

To satisfy both the ICC and the federal and state taxing authorities, appellant elected in 1950 or 1951 to create a dual system of accounting, consisting of: (1) the books and records maintained in compliance with the ICC accounting system, and (2) the records necessary to carry forward the generally accepted accounting principles system, established when the company was formed. Throughout the proceedings, the Comptroller's office has characterized appellant's second system of accounting as merely "working papers."

To avoid overlapping entries in its dual system of accounting, appellant records any transaction common to both systems only one time in the ICC books, and records any transaction affecting only one system in that system alone. It is not unusual that regulated companies, like appellant, must create and maintain two or more sets of books and accounting systems in order to satisfy governmental regulations. In fact, the Comptroller's office admitted at trial that regulated corporations must often maintain two general ledgers.

In 1950, appellant notified the Secretary of State, the office then charged with responsibility for collecting the franchise tax, that appellant had adopted its dual system of accounting. At that time, appellant attached a statement to its franchise tax reports stating that the ICC accounting system did not meet with generally accepted accounting principles. Appellant also attached balance sheets and profit and loss statements to its franchise tax reports showing two sets of figures, one under the ICC books and the other in accordance with generally accepted accounting principles.

Appellant's ICC books have been used only to satisfy the regulations and reporting procedures required by the ICC. At the same time, appellant's records carrying forward generally accepted accounting principles have always been used to report its franchise tax returns and almost all other corporate activities. As previously noted, the ICC books do not comply fully with generally accepted accounting principles.

Attention is now directed to the Comptroller's audit, the conduct of which forms the basis of this suit. The Comptroller's audits are carried forward in three steps: (1) initial introduction, (2) field work, and (3) exit conference. In the initial introduction, the auditor informs the taxpayer "basically what records we will need to look at, why he was audited."

In response to the "initial introduction," appellant's official furnished the auditor with the company's books and records maintained to comply with the ICC accounting system. The auditor, however, had access to all of appellant's financial records.

The evidence is conflicting as to what the auditor told appellant's official at the initial introduction and as to what records that official understood that the auditor was requesting. The auditor's memory varied considerably. On deposition, he swore that he explained to appellant's office that he was to conduct a sales tax audit, but he testified that he told the official that he was to conduct a franchise tax audit. Finally, the auditor stated that, indeed, he did not specify what type of tax he was examining when he requested appellant's records. Whatever the auditor may have told appellant's official, it is clear that the company official did not understand him to announce that he was conducting a franchise tax audit.

The type of audit to be conducted is important because that determines what records are needed. The ICC records furnished the auditor contained the data for a sales tax audit, but not information for a franchise tax audit.

It developed that the Comptroller's agent conducted both a sales tax and a franchise tax audit which took two or three weeks. The audit of franchise taxes for 1968 through 1974 revealed a tax deficiency of $8,674.41, which the Comptroller's agent assessed without inquiring of appellant why the information in the ICC ledger was different from appellant's franchise tax returns for the years in question. As written previously, appellant's franchise tax returns had never been prepared from the books and records appellant maintained to comply with the ICC accounting system.

After the "field work" was completed, the "exit conference" was held, and appellant was informed for the first time that a deficiency had been assessed for the years in question, based upon the figures taken from the ICC ledger. At that time, appellant's officer explained to the auditor the history and reasons for the dual accounting systems and tendered for examination the company's other set of records from which the franchise tax reports were prepared. Appellant's officer told the auditor that the ICC ledger was not what appellant used to compute its franchise taxes since 1950.

The auditor refused to examine appellant's generally accepted accounting principle records since they were "not held out to be a general ledger during the field work of the audit." The auditor concluded also that appellant could not use its generally accepted accounting principles books and records to compute its franchise taxes because he considered them as mere "working papers."

Appellant complains that when the auditor chose not to review appellant's books and records from which appellant had filed its franchise tax returns, the auditor acted arbitrarily and illegally resulting in substantial injury to appellant. This Court agrees.

Comptroller's Ruling 80–0.06 (1961) provides in part that "Corporations are required to file franchise tax returns showing their financial condition as reflected by their books." The Comptroller admits, through answers to interrogatories and the testimony of its auditor, that the long-standing departmental construction of his office has been that the books and records of a corporation to be used in determining franchise taxes are those that comply with generally accepted accounting principles. Appellant's ICC books and records examined by the auditor do not comply with generally accepted accounting principles, except as to depreciation schedules. On the other hand, the undisputed evidence is that appellant's regular set of books and records, which the auditor refused to examine, is, and always has been, maintained completely in accordance with generally accepted accounting principles. Accordingly, under the Comptroller's own long-standing policy, appellant was bound to report its franchise taxes based upon its regular books and records, and not its ICC system of accounting. At this late date the Comptroller should not, and will not, be allowed to resort to another system of accounting to compute a larger liability on the part of the taxpayer. *Bullock v. King Resources Co.*, 555 S.W.2d 789 (Tex.Civ.App.1977, no writ).

The Comptroller, however, claims that appellant's ICC books and records comprise

appellant's "general ledger," and that the "general ledger" is all that it was obliged to consider under Comptroller's Ruling 80–0.06 (1961) and the Comptroller's Procedural Manual for State Tax Audits.

It is plain, we think, that since the Comptroller's own long-standing policy mandates the use of books and records kept according to generally accepted accounting principles to determine franchise taxes, that the very same books and records should be examined during the audit of franchise tax reports.

The Comptroller's Procedural Manual does not require otherwise. Section 5(12)32 § 1 does provide that "the first record that should be asked for is the general ledger of the corporation." Section 5(12)32 § 2 is entitled "Other Corporate Records to be Used to Verify Franchise Tax Liability." In that section the manual suggests that the auditor examine any General Journals, Cost Disbursements, Receipts, Purchase and Sales Journals, Minute Books, Stock Certificates and other Legal Corporate Records. Section 5(12)32 § 3 deals with audits involving corporations that lack regular records. This section states in part:

> "In such a case, we must remember that we are not in a position to tell anyone how records must be kept . . . An Auditor must use his own good judgment in such an event and try, without making an issue of it, to get the necessary and pertinent data."

Section 5(12)32 § 4, on the other hand, instructs the auditor when voluminous corporate records are involved:

> "In such cases, we must, to a certain extent, rely on the corporation's own system of internal controls and work from the financial statements . . . Also, if an accounting firm prepared return, the accountant's working papers will answer most questions that need to be asked. Here again, the Auditor must rely on his own judgment."

The quoted sections from the Comptroller's Manual indicate that the auditor should examine *all records* that contain information to verify the franchise tax liability of the audited corporation. The auditor should not select an accounting system to be used for computing franchise taxes so long as the system selected by the corporation meets the substantive requirements of the Comptroller.

In this connection, the Comptroller's auditor testified that there is no specific format for a "general ledger." The auditor admitted that the content of a set of working papers is more important than its form, and that it was the Comptroller's departmental policy to look to these types of records when performing a franchise tax audit, in order to "validate amounts and balances in the general ledger."

This Court has concluded that when a franchise tax audit is conducted, the Comptroller by virtue of his own manual and departmental policy, is required to examine all books and records, whether labeled "general ledger" or not, that comport with generally accepted accounting principles. It is manifest from this record that the Comptroller refused to examine all such books and records.

The judgment of the district court is reversed and judgment here rendered that appellant recover those sums paid under protest with interest.

POWERS, J., not sitting.